**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

**RETTA COPELAND,**

       Plaintiffs,

v.                                                                    Civil Action No. 7:12-CV-24 (HL)

**GEORGIA DEPARTMENT**
**OF JUVENILE JUSTICE**,

       Defendant.

**ORDER**

This case is before the Court on Defendant=s Motion for Summary

Judgment (Doc. 17). Plaintiff has filed a response, and Defendant has filed a

reply. Upon review of the briefs, depositions, and other evidence, Defendant=s

Motion for Summary Judgment is granted.

**I.      SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56 requires that summary judgment be

granted "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.

56(a). "The moving party bears 'the initial responsibility of informing the . . . court

of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue of

material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir.

2004) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257, 106 S.Ct. 2505 (1986).

The applicable substantive law identifies which facts are material. <u>Id.</u> at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. <u>Id.</u> An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Id.</u> at 249–50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. <u>Patton v. Trial Guar. Ins. Corp.</u>, 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986))."If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Local Rule 56

In accordance with Local Rule 56, Defendant filed a statement of material facts to which it contends there is no genuine dispute. (Doc. 30). Each fact statement is properly supported by a specific citation to the record. *See* M.D. Ga. L.R. 56.

Local Rule 56 requires the non-moving party to respond to each of the movant's numbered material facts. "All material facts contained in the moving party's statement which are not specifically controverted by specific citation to the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56. In her response to Defendant's statement of material facts, Plaintiff denies many of Defendant's statements but does not specifically controvert the statements by specific citation to the record. *See* Responses No. 17, 18, 20, 21, 23, 24, 29, 31, 35, 37, 38, 39, 44, 46, 47, 48, 49, 51, 53, 55, 56, 57, 62, 63, 64, 71, 73. Therefore, in accordance with Local Rule 56, these particular facts contained in Defendant's statement are deemed admitted.[1]

---

[1] The Court believes strict application of Local Rule 56 is appropriate in this case. Plaintiff's counsel has appeared in scores of cases in this district, both in this division and elsewhere, and should be able to recite Local Rule 56 by heart. She should be well aware of the Court's requirements.

Plaintiff included her own statement of material facts in her response to Defendant's statement. To the extent they do not conflict with the admitted facts contained in Defendant's statement of material facts, the Court will consider Plaintiff's asserted undisputed material facts and Defendant's response to the same as it normally does in a summary judgment context. However, the Court will disregard statements in the form of arguments, issues, or legal conclusions contained therein.

Even though certain of Defendant's submitted facts are deemed admitted, Defendant "continues to shoulder the initial burden of production in demonstrating the absence of any genuine issue of material fact, and the court must satisfy itself that the burden has been satisfactorily discharged." Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008). The Court must "review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact." Id. at 1269 (quotation and internal quotation marks omitted). The Court has so reviewed the record, and viewed in the light most favorable to Plaintiff, finds the facts for purposes of summary judgment to be as follows.

---

Plaintiff also attempts to qualify many of her admissions, but fails to cite to the record and provide support for her responses. *See, e.g.,* Responses No. 16, 20, 36.

### B.    Plaintiff's Employment at Sumter YDC

Plaintiff began working for Defendant in February of 2005. She started working at the Sumter Youth Development Campus ("Sumter YDC") in the late summer of 2005. The Sumter YDC is a lockup facility for youth offenders who have committed adult crimes. In 2010, Plaintiff was employed as a Special Education teacher. She taught classes in math, language, and social skills. Plaintiff reported directly to Larry Gibbs, the Principal at Sumter YDC.

Plaintiff taught four classes in the morning and two classes in the afternoon. Her fourth period students were dismissed at 11:55, and the lunch period followed until 1:00 p.m. The students left for the day at 3:00 p.m., and the end of Plaintiff's work day was at 4:00 p.m. Plaintiff had her own classroom, and all her classes were taught in the same classroom. Her duties included helping disabled students with potential learning disabilities and behavior problems understand standard course material in a simpler form.

### C.    Events Related to August 2010 Incident Involving J.T.

On August 12, 2010, during Plaintiff's sixth period class, a student named J.T. kicked a metal trash can, and the can hit Plaintiff in the knee. J.T. left the classroom immediately thereafter. Plaintiff spoke with a school security officer after the incident.[2]

---

[2] Plaintiff states she had problems with J.T. prior to the August 12 incident. She had previously written disciplinary referrals on him.

J.T. was reassigned out of Plaintiff's classroom approximately two weeks after the incident. The delay in transferring J.T. occurred because there was not another special education math teacher and the student had to be moved to a regular math class, which took time.

Both a Disciplinary Referral form and a Special Incident Report were completed on August 12, 2010 regarding the incident. A Special Incident Report is used to document incidents where either a student or teacher is injured or hurt. Plaintiff also spoke with Mr. Gibbs and told him she was injured.[3]

On the morning of August 13 Plaintiff told Mr. Gibbs she was going to the doctor. Mr. Gibbs consulted with Shawn Banks, Director of the Sumter YDC, about the protocol for a work-related injury. Mr. Gibbs then informed Plaintiff that she could see a worker's compensation doctor. Plaintiff saw a physician at Archbold Primary Care in Thomasville. The injury was diagnosed as "acute [left] knee contusion." (Deposition of Retta Copeland, Ex. 2). Plaintiff's knee was x-rayed, and the radiological consult stated: "Four views of the left knee demonstrate no fracture or dislocation. No significant joint effusion. Compartmental spaces are preserved." (Pl. Dep. Ex. 2). Plaintiff was told to ice her knee and was prescribed medication and a knee brace. She was also

---

[3] There appears to be some dispute over whether a surveillance tape of the incident definitively shows that the trash can hit Plaintiff's knee. This dispute is not material to the case, however, as Defendant has conceded for purposes of this motion that Plaintiff did injure her knee in the August 12 incident.

prescribed physical therapy. Plaintiff returned to the doctor the following Friday and approximately six more times, but experienced no real recovery from the knee pain.

Plaintiff was also given certain work restrictions: no prolonged standing or walking, no climbing, bending or stooping, and no kneeling. (Pl. Dep. Ex. 2). Plaintiff was out of work from Friday, August 13 until Tuesday, August 17, 2010. According to Plaintiff, these work restrictions did not impact her duties as a teacher at all. Her students were allowed to pull their desks up close to her desk, and she "was able to work and perform my job." (Pl. Dep. p. 54). Plaintiff could sit at her desk to teach, which limited her need to stand, walk, climb, kneel, bend, or stoop. It did take her longer to walk from the parking lot to the school. At no time did Plaintiff request a handicapped parking permit due to her injury.

When Plaintiff returned to work on August 17, she was given a Reminder 1 by Mr. Gibbs for failing to use proper Alternative Education Placement Model ("AEPM") procedures and for violating security procedures by not giving notification that a student left her class without permission and unescorted. (Pl. Dep. Ex. 3; Declaration of Larry Gibbs, ¶ 5). The AEPM is a classroom behavior management program that utilizes an alternative classroom setting to improve classroom behavior. Under AEPM a disruptive or problem student is moved into

a special classroom setup that essentially isolates the student from other students.

Prior to a student being sent to AEPM, the student should be given a visual warning by the teacher writing the student's name on the board and should be told the behavior may lead to the student being sent to AEPM. If the student's behavior continues, the student should be escorted to the AEPM area immediately. In the Reminder 1, Mr. Gibbs stated that Plaintiff violated AEPM procedures because J.T. was not given a warning prior to being sent to AEPM, and the student left the classroom without permission and unescorted. Plaintiff's pay was not affected by the Reminder 1.

Plaintiff now contends she followed proper procedure by speaking with a school security officer after the incident and that she did not have time or the opportunity to implement AEPM procedures because the incident happened so fast. However, in the comment section Plaintiff completed on the Reminder 1, she did not dispute that she did not follow proper procedure or state that she did not have time to follow procedure. Instead, she said she did not have dry erase markers or chalk to use to write names on the board and had been told she was sending too many students to AEPM.

Also on August 17, Plaintiff was given a Reminder 2 by Mr. Gibbs for entering information on a Special Incident Report and on an Academic Tracking

Sheet that he believed was demeaning to J.T. Plaintiff wrote on the documents that "[J.T.] is very confused about his sexuality and that is all he wants to talk about." She also wrote that "[h]e is into threatening and terrorizing staff about writing grievances, going to LaShonda Williams,[4] getting bitches fired in his own words. . . ." (Pl. Dep. Ex. 4). Plaintiff's pay was not affected by the Reminder 2.

Also on August 17, Mr. Gibbs had a Performance Improvement Discussion with Plaintiff regarding her interactions with J.T. The student had previously filed a grievance against Plaintiff and it did not appear to Mr. Gibbs that the relationship was improving. Plaintiff's pay was not impacted by the Performance Improvement Discussion.

Plaintiff wrote rebuttals to both Reminder 1 and Reminder 2. She then filed two grievances on August 17 against Mr. Gibbs and Ms. Williams regarding Reminder 1 and Reminder 2.[5] On August 24, Plaintiff filed another grievance against Mr. Gibbs and Ms. Williams in which she listed the problem as: "Discrimination on the basis of race/gender. Lashonda Williams and Larry Gibbs. Harassment because students have been moved from white teachers class. Not providing proper medical attention." (Pl. Dep. Ex. 9). She complained in the

---

[4] LaShonda Williams was the Assistant Director of the Sumter YDC during the time period in question. Mr. Gibbs reported to her.

[5] Plaintiff did not mention any sort of discrimination in the August 17 grievances.

grievance about J.T. being allowed to remain in her class and having received Reminder 1 and Reminder 2. The relief requested was "Lashonda Williams and Larry Gibbs both stop harassing me and creating a hostile environment for me to work." (Pl. Dep. Ex. 9).

Plaintiff testified in her deposition that she filed the grievance because other white teachers had disruptive students moved or their schedules changed, but J.T. was still in her classroom. She also claimed that certain employees on several occasions "would walk by and make derogatory statements talking to each other but aimed toward me, and they would often walk past me and turn their nose up as if they felt -- smelled an undesirable odor and look at me from head to toe with a scornful look," (Pl. Dep. p. 44), and on one occasion an employee said to another employee that "I have to work for a living. Not like other people who are walking around pretend to be injured or hurt or sick." (Pl. Dep. p. 45). This behavior on the other employees' part is alleged to have begun when Plaintiff filed the grievances against Mr. Gibbs and Ms. Williams on August 17. Plaintiff states she complained to Mr. Banks, but the behavior got worse and led to the filing of the August 24 grievance.

Christopher Jones, a Personnel Analyst in Defendant's Employment Relations/EEO Section, was assigned to conduct an investigation of Plaintiff's complaints. Mr. Jones interviewed several people, including Plaintiff. Mr. Jones

eventually concluded that "the investigation <u>does not substantiate</u> the allegations that Ms. Copeland had been subjected to <u>race</u> and/or <u>gender</u> discrimination." (Affidavit of Christopher Jones, Ex. A) (emphasis in original).

### D.    Initial Accommodation Request and Related Events

On August 18, 2010, Plaintiff made accommodation requests relating to her knee injury and work restrictions. Specifically, Plaintiff requested that she be allowed to leave her classroom five minutes ahead of all other staff both at lunch and at the end of the day so she would not have to wait in line to clock in and out. Plaintiff made this request verbally and in writing to Mr. Gibbs.[6] Mr. Gibbs granted Plaintiff the five minute accommodation. Plaintiff contends the request was initially effectively denied because Mr. Gibbs never sent anyone to cover her classroom and she could not leave the room unsupervised. However, Plaintiff admits she eventually was allowed to leave her classroom at 3:55 p.m.[7]

Plaintiff also asserts that upon her return to work she made an alternative accommodation request that security be notified of her lunch time so that they

---

[6] Plaintiff was the first employee Mr. Banks could remember ever requesting an accommodation.

[7] This is not the only time Plaintiff made the accommodation request that she be allowed to leave early at lunch and at the end of the day. The second instance is discussed in Section II(E) *infra*. There really is not much evidence in the record as to what happened during the August 18 to September 27 time period with respect to the early leave request.

would be waiting and available, thus avoiding her having to wait for security. Plaintiff states no one ever responded to this request.

Plaintiff also requested that she be allowed to arrive 30 minutes early and leave 30 minutes early on days when she had physical therapy appointments. On September 1, 2010, Mr. Gibbs agreed to allow Plaintiff to leave early on Mondays and Wednesdays for physical therapy. Mr. Gibbs informed Plaintiff that pursuant to the Defendant's workers' compensation policy, she had to take leave if she left work early.[8] Plaintiff was not allowed to make up the time at the beginning of the day to avoid using her leave. Plaintiff contends that another employee, Clifton Clark, a black male, was allowed to leave early to accommodate his special education certification courses. According to Mr. Gibbs, Mr. Clark was allowed to come to work 30 minutes early and leave 30 minutes early two days a week to take classes to get a teaching certification. Mr. Clark did have to take leave if he did not make up his time.

On September 15, 2010, Plaintiff received a Reminder 1 from Mr. Gibbs which stated: "Ms. Copeland requested sick leave on the clock at 3:52 on 09/09/10. Ms. Copeland did not report to work and took unauthorized leave for the next day, 09/10/10. Advance time should have been given so that plans could

---

[8] Policy No. 3.27, Workers' Compensation, states in pertinent part that in terms of leave, an employee may use some or all of her accrued Fair Labor Standards Act compensatory time; use sick, annual, or personal leave; or receive workers' compensation payments for lost salary during the period of the employee's absence from work. (Affidavit of Patricia Wallace, Ex. C).

have been made to cover her class. This issue has been discussed in prior faculty meetings and the need to have no more than two teachers out on any day was emphasized." (Pl. Dep. Ex. 20). Because Plaintiff requested leave for the next day right before the end of the September 9 school day, Mr. Gibbs had to scramble to cover her classroom for September 10. The Reminder 1 initially stated that Plaintiff had placed her name on the board where teachers write their leave even though the maximum number of teachers were scheduled to be off on September 10. Plaintiff disputed that she put her name on the board, and Mr. Gibbs issued a corrected Reminder 1 to remove the statement about Plaintiff placing her name on the board. Plaintiff contends Mr. Gibbs did not correct the copy located in the personnel office. Plaintiff also contends that the leave was authorized.

On September 22, 2010, Mr. Gibbs came to Plaintiff's classroom with a substitute teacher and told her that Mr. Banks wanted to see her. Mr. Banks was standing in Ms. Williams' office when Plaintiff arrived and he invited Plaintiff into Ms. Williams' office. Mr. Gibbs and Jan Parker, a secretary, were also present. According to Plaintiff, Mr. Banks began to scream at her, pointed his finger in her face, and told Plaintiff he was giving her a direct order not to contact anyone at the central office without his prior approval. He asked Plaintiff three times if she understood, and each time she said yes. He also asked Mr. Gibbs and Ms.

Williams if they understood. The meeting ended around 4:00 p.m. Mr. Banks did not reference Plaintiff's race, gender, or disability during this conversation.[9]

On September 23, 2010, Plaintiff sent an email to Ronnie Woodard, Sam Clonts,[10] and others regarding the September 22 meeting. Plaintiff stated in her email that Mr. Banks screamed and scolded her for emails she had sent. Plaintiff also filed a grievance on September 23 alleging that "Director Shawn Banks screamed, hollered and verbally threatened me in the presence of assistant director LaShonda Williams, Principal Larry Gibbs and Ms. Jan Parker." Plaintiff also alleged in her grievance that she was being discriminated against on the basis of race and gender.

On October 1, 2010, Plaintiff sent a note to Mr. Woodard appealing the Reminder 1 she received on September 15, 2010. Plaintiff acknowledged in her note that she applied for sick leave at 3:52 p.m. on September 9 to officially take leave on September 10, 2010.

---

[9] Mr. Banks admits the meeting took place, but denies he yelled at Plaintiff or pointed his finger in her face. He states the purpose of the meeting was to talk about the chain of command and Plaintiff sending student information via email, which is discussed below. According to one of Plaintiff's emails, the chain of command issue and the student information issue were both in fact discussed at the meeting.

[10] Mr. Woodard is the Director of Secure Campuses for Defendant and was Mr. Banks' supervisor. He was also responsible for reviewing adverse personnel actions. Mr. Clonts is with Defendant's Human Resources department, and also reviewed adverse actions.

### E.     Events of September 2010 Regarding Lobby of Administrative Building

Because the Sumter YDC is a detention center, maintaining security throughout the campus is a priority. The lobby of the administration building was an area where teachers gathered, visitors checked into the facility and were searched, and students were occasionally moved through to speak with administrators. At times there were large numbers of people in the lobby, which caused a great deal of chaos. The front desk security guard complained to Mr. Banks and others about the number of people in the lobby.

Mr. Woodard, as Director of Secure Campuses, and Mr. Banks, as Director of Sumter YDC, had discussions about security at Sumter YDC, in particular about the lobby area of the administrative building and people sitting in that area.[11] They both believed people sitting in the lobby area was a security risk. To that end, on September 23, 2010, Ms. Williams sent an email to all Sumter YDC staff that stated:

> EFFECTIVE IMMEDIATELY: No breaks, lunches, or waiting to clock out will take place in the front lobby of Sumter YDC no exceptions. You may take your break, lunch, etc. in the multi-purpose room, you may leave the facility, you can sit in your car whatever you choose but sitting in the front lobby of building one is no longer an option. Any questions concerns or comments please

---

[11] According to Mr. Banks, these discussions regarding security began several months before Ms. Williams sent out the September 23rd email prohibiting staff from sitting in the front lobby. Plaintiff has presented no evidence to the contrary.

> direct them to your immediate supervisor. Thanks in
> advance for your cooperation with this matter.

(Pl. Dep. Ex. 13).

According to Ms. Williams, not only was the security guard having difficulty keeping track of people entering the building, the noise that was being produced in the area was creating an unprofessional environment. Employees were permitted to sit in other places, including the multi-purpose room and the administrative lounge.

Plaintiff states she talked to Mr. Gibbs on the same day the email was sent and requested an accommodation because she could not stand in line with all the other workers to clock in and out. Mr. Gibbs told her she needed to speak to Ms. Williams and Mr. Banks, which she did. Plaintiff states Ms. Williams sent an email stating there were no exceptions to the rule.

On September 27, 2010, Plaintiff emailed Ms. Williams, Mr. Banks, and Mr. Gibbs and requested an accommodation since she was no longer allowed to sit in the front lobby for lunch or to clock in and out. She requested that she be allowed to leave the education building at least five or ten minutes prior to other staff in order to clock in and out both at lunch and at the end of the day so she did not have to stand in line and wait to clock in and out. Mr. Gibbs told Plaintiff she could go down to clock out at 3:55 p.m., which was five minutes before other school employees clocked out.  Mr. Gibbs also told Plaintiff she could adjust her

time to clock in and out for her 30 minute lunch break at any time between 12:00 p.m. and 1:00 p.m. It is undisputed that Plaintiff was not allowed to sit in the lobby and that she was made aware that she was not supposed to sit in the lobby area.

Plaintiff testified that she eventually gave up eating lunch at one point in favor of just sitting down for 30 minutes because at times she would still end up having to stand in line at the time clock. Plaintiff also did not want to have to stand in line to get into the multi-purpose room to eat lunch or walk from the time clock to the multi-purpose room, which was approximately eight feet away.

### F.      September and October 2010 Events Related to Email

On September 17, 2010, Plaintiff sent an email to the following: "rettabcopeland@windstream.net, Retta Copeland, retta.copeland@mchsi.com, and revadams@rose.net." The email was addressed to Mr. Gibbs, and stated in part: "You and Lashonda Williams, both accused me of falsifying documents in the reminder 2 that you wrote on me on August 17, 2010. As I stated in my rebuttal, I have never falsified any document and I did NOT falsify any record, when I stated in [J.T.'s] tracking records that he constantly talks about his homosexuality and that of other students. That was a true statement then and it is still the truth now." (Affidavit of LaShonda Williams, Ex. A). The email was forwarded to Mr. Gibbs by Plaintiff on September 21, 2010.

17

Plaintiff subsequently received a Decision-Making Leave worksheet on October 8 for violating an internal policy and a security agreement for sending "an email on September 21, 2010, to an unknown source (not DJJ related) that included the name and personal information about a youth housed on the campus of Sumter Youth Development Campus." The worksheet references Plaintiff sending the email to revadams@rose.net.[12] (Pl. Dep. Ex. 23; Williams Aff. Ex. A). Plaintiff was advised in the notice that if she did not "abide by the policies and procedures as set forth by DJJ the next step in the disciplinary process could be termination. Ms. Copeland is to be subordinate, respectful, and professional at all times." (Pl. Dep. Ex. 23). The notice reflected that Mr. Gibbs and Plaintiff had a discussion about the email matter, and that she did not agree with the discipline because she did not believe she violated the policy or security agreement. Plaintiff was put on leave for the day of October 12 so she could decide whether she wanted to solve the immediate problem and commit to her job or resign and find employment elsewhere.

Plaintiff received a follow-up memorandum from Mr. Gibbs on October 13, which reflected that Plaintiff decided she wanted to continue her employment with Defendant. In the memorandum, Plaintiff was warned that "[y]ou must maintain fully acceptable performance in every area of your job, whether related

---

[12] The email address revadams@rose.net belongs a friend of Plaintiff. Plaintiff states she saved the email at issue on the minister's computer because Plaintiff's personal computer was not working.

to this issue or not, since any further problems that require disciplinary action will result in termination." (Pl. Dep. Ex. 24). Plaintiff complained about the Decision Making Leave in emails to Mr. Woodard and Mr. Clonts dated October 14 and October 19, respectively. The Decision Making Leave was upheld by in a final decision from Mr. Clonts dated October 20.

### G.    Suspension and Termination

On October 14, 2010, Mr. Banks saw Plaintiff sitting in the lobby of the administration building. Mr. Banks spoke with her about not sitting in the lobby. Plaintiff told Mr. Banks she had permission from Mr. Woodard to sit in the lobby, but when Mr. Banks spoke with Mr. Woodard that same day, Mr. Woodard said he had not given such permission to Plaintiff.

On October 19, Mr. Banks saw Plaintiff sitting in the lobby again at approximately 12:15 p.m. Mr. Banks told Plaintiff that she could not sit in the lobby and asked her to move to the administrative lounge or multi-purpose room. Plaintiff refused. Mr. Banks characterized Plaintiff as combative.[13] Plaintiff was placed on administrative leave for the remainder of the day for failing to comply with Mr. Banks' request not to sit in the lobby. Plaintiff was to return to work the next morning.

---

[13] According to Banks, Plaintiff was combative on other occasions as she would at times yell out while in the front lobby to no one in particular: "[T]hey can't make me not sit here. This is where I sit." (Deposition of Shawn Banks, p. 48).

In her October 19 email to Mr. Clonts, Plaintiff stated: "Mr. Clonts, I want to inform you that Mr. Shawn Banks, the director at Sumter YDC sent me home today at around 12:37 p.m. on administrative leave because I sat in the front lobby there." (Pl. Dep. Ex. 26). Mr. Clonts responded to the email and stated he agreed with the leave.

When Plaintiff returned to campus on October 20, Mr. Banks asked her to come to his office for a meeting. Ms. Williams was in the office for the meeting as well. Mr. Banks intended to discuss with Plaintiff, and give her in writing, the expectations he had of her moving forward. Plaintiff would not enter Mr. Banks' office without a witness. Mr. Banks asked her to come into his office three times, and Plaintiff refused each time. After Plaintiff refused to enter Mr. Banks' office, he suspended Plaintiff with pay due to insubordination. Mr. Banks then requested approval to terminate Plaintiff's employment through Mr. Woodard and Defendant's legal office.

Plaintiff was asked to return to the facility, and on October 27, 2010, Plaintiff was presented with a letter by Mr. Banks and Ms. Williams stating she was being dismissed from employment effective November 2, 2010. Plaintiff was fired for insubordination stemming from her refusal to enter Mr. Banks' office on October 20. Plaintiff was the first employee Mr. Banks fired for insubordination,

and he had never disciplined any employees other than Plaintiff for insubordination.

Ms. Parker testified that on different occasions she saw various employees sitting in the lobby, but she was not aware of any of those employees being disciplined for sitting in the lobby. However, Mr. Banks, the official who disciplined Plaintiff for sitting in the lobby and refusing to move, did not see anyone sitting in the lobby other than Plaintiff.

### H.   Ordering School Supplies

Two white female employees were in charge of ordering school supplies. Plaintiff states she was never given the opportunity to order her own supplies, and at times the materials ordered caused her to have to improvise or get materials from other teachers because she ran short. Plaintiff requested of Mr. Gibbs three or four times that she receive special materials for her classes, and he referred her to the two ordering employees.

### I.   EEOC Charges and Lawsuit

Plaintiff filed an Employment Discrimination Complaint, EEOC No. 11B-2010-00177, which was received by the Georgia Commission on Equal Opportunity on September 15, 2010. Plaintiff received a Notice of Right to Sue for Charge No. 11B-2010-00177 on or about November 17, 2011.

Plaintiff filed another Employment Discrimination Complaint, EEOC No. 11B-2011-00029, which was received by the Georgia Commission on Equal Opportunity on November 12, 2010. Plaintiff received a Notice of Right to Sue for Charge No. 11B-2011-00029 on or about November 17, 2011.

On February 8, 2012, Plaintiff filed a lawsuit against Defendant, alleging disability discrimination, hostile work environment, racial discrimination, and retaliation. Defendant has now moved for summary judgment on all of Plaintiff' claims.

## III.    ANALYSIS

### A.    Rehabilitation Act/Americans with Disabilities Act

AThe [Rehabilitation] Act prohibits federal agencies from discriminating in employment against otherwise qualified individuals with a disability.@ Mullins v. Crowell, 228 F.3d 1305, 1313 (11th Cir. 2000); *see also* Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005). Rehabilitation Act claims are analyzed in the same manner as claims brought under the Americans with Disabilities Act (AADA@. 29 U.S.C. ▪ 7949(d); Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000); Sutton v. Lader, 185 F.3d 1203, 1207 n. 5 (11th Cir. 1999). The Eleventh Circuit has established that cases decided under the ADA are precedent for cases under the Rehabilitation Act, and vice-versa. Pritchard v. S. Co. Servs., 92 F.3d 1130, 1132 n. 2 (11th Cir. 1996).

It appears from Plaintiff's complaint and summary judgment briefing that she alleges two ADA and Rehabilitation Act claims: (1) Defendant failed to provide her with a reasonable accommodation for an actual or perceived disability; and (2) Plaintiff suffered adverse employment actions as a result of her actual or perceived disability. The Court will address each separately.

### 1.    Failure to provide reasonable accommodation

Plaintiff contends she was entitled to three accommodations: (1) being allowed to leave her classroom five minutes early for lunch and at the end of the day so that she would not have to stand in line to clock in and out; (2) being allowed to come to work and leave work 30 minutes early so that she could attend physical therapy appointments; and (3) being allowed to sit in the lobby. Defendant contends that Plaintiff was not entitled to any of these accommodations because they would not assist her in the essential functions of her job. But in the event the Court determines Plaintiff was entitled to any of the accommodations, Defendant argues that Plaintiff was either given the accommodations, or the requested accommodation was not reasonable.

"An employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1262 (11th Cir. 2007) (emphasis in

original). To state a prima facie claim for failure to accommodate, the plaintiff must show that: (1) she is disabled; (2) she is a qualified individual; and (3) she was discriminated against by the defendant's failure to provide a reasonable accommodation.[14] *See* <u>Lucas v. W.W. Grainger, Inc.</u>, 257 F.3d 1249, 1255 (11th Cir. 2001). "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." <u>Id.</u> at 1255-56. An employer is not required to accommodate an employee in any manner in which the employee desires. <u>Stewart v. Happy Herman's Cheshire Bridge, Inc.</u>, 117 F.3d 1278, 1285-86 (11th Cir. 1997).

"An accommodation can qualify as 'reasonable' . . . only if it enables the employee to perform the essential functions of the job." *See* <u>Lucas</u>, 257 F.3d at 1255. "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). "Whether a function is essential is evaluated on a case-by-

---

[14] "The term 'reasonable accommodation' may include -- (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9).

case basis by examining a number of factors." <u>Davis v. Fla. Power & Light Co.</u>, 205 F.3d 1301, 1305 (11th Cir. 2000).[15]

Defendant contends that the requested accommodations would not assist Plaintiff with performing the essential functions of her teaching position, thus making judgment in Defendant's favor appropriate.[16] Instead, the accommodations Plaintiff requested were to assist her with clocking in and out of work, which Defendant asserts was an administrative task, not an essential function of Plaintiff's teaching position. In response, Plaintiff states that the accommodations were requested not only applied to clocking in and out, but also for going through security, and going through security was an essential function of Plaintiff's position. In reply, Defendant states that Plaintiff has presented no

---

[15] "Evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3).

[16] Defendant has a policy relating to accommodation requests made pursuant to the ADA which states that the request must be accompanied by medical validation. (Wallace Aff. Ex. B). An "ADA Physician's Statement" which is completed by the employee's attending physician serves as the medical validation. Defendant did not receive an ADA Physician's Statement from Plaintiff or any of her physicians, but Defendant did not specifically ask Plaintiff for such a statement. Plaintiff did submit some medical documentation to the Sumter YDC which listed her injury and work restrictions. Defendant argues in its summary judgment motion that Plaintiff's failure to accommodate claim fails because Plaintiff did not provide an ADA Physician's Statement in compliance with the ADA policy. However, the argument is one sentence long and is completely undeveloped and unsupported by legal citations. The Court will not consider this argument as a basis for the relief sought by Defendant.

evidence that going through security and clocking in and out were fundamental job duties for a teacher at the Sumter YDC. Passing through security is required of every person that enters the facility, teacher or not, and clocking in and out is a requirement of every teacher. In other words, while going through security and using the time clock were perquisites for attending work, they were not primary functions of Plaintiff's teaching position.

Assuming for the purposes of this Order only that Plaintiff was entitled to an accommodation, the Court finds that Plaintiff's claim fails because she was given reasonable accommodations.

It is undisputed that Plaintiff was allowed to leave her classroom five minutes early to clock out at the end of the day. She was also allowed to take her 30 minute lunch break at any time between noon and 1:00 p.m., which would allow her to miss the security line at noon and 1:00 if she so chose. While Plaintiff states the accommodation was effectively denied for at least a time because Mr. Gibbs did not send anyone to cover her classroom and she could not leave students unsupervised, her schedule contradicts that proposition. The students left at 3:00, so there would no one in the room at 3:55 to supervise. Further, Plaintiff's last class before lunch ended at 11:55, which means there were no kids to supervise. In any event, Plaintiff was given permission to go to

lunch at any time between 12:00 and 1:00, which was certainly a reasonable accommodation.

Plaintiff was given permission to leave 30 minutes early to go to physical therapy twice a week. While she was not allowed to come in 30 minutes early to make up that time, rather than taking leave, it is undisputed that Plaintiff was subject to Defendant's workers' compensation policy, which requires employees to take leave when absent from work. Defendant was not required to set aside or disregard its policy to accommodate Plaintiff.[17]

Plaintiff's final request was that she be allowed to sit in the lobby to eat lunch or to clock in or out so as to avoid standing in the security line. However, the problem of having to stand in line would be resolved through the granted accommodations of allowing Plaintiff to leave at 3:55 p.m. and take her lunch whenever she chose between noon and 1:00 p.m. While it may have been Plaintiff's preference to sit in the lobby for her entire lunch break or any other time she wanted to sit, Plaintiff is not entitled to her preferred accommodation, only a reasonable one.

Plaintiff has not established a prima facie failure to accommodate claim. The evidence does not demonstrate a failure to provide reasonable accommodations by Defendant. Thus, Defendant's motion is granted with

---

[17] Plaintiff and Clifton Clark are not similarly situated for purposes of the leave issue, as Mr. Clark was not subject to the workers' compensation policy. This is further discussed in the next section relating to Plaintiff's disability discrimination claim.

respect to Plaintiff's claim for failure to accommodate under the ADA and Rehabilitation Act.

### 2.    Disability discrimination

Plaintiff contends she was subjected to disparate treatment based on her disability. First, she contends the Reminder 1, Reminder 2, and Performance Improvement Discussion she received on August 17, 2010 were discriminatory. Second, she claims she was discriminated against when she was required to take leave for her physical therapy and Mr. Clark was allowed to come in early to make up time while he was pursuing his certification. Finally, she alleges she was discriminated against because she was reprimanded for sitting in the lobby while other non-disabled employees did not get in trouble.[18]

The <u>McDonnell Douglas</u> burden-shifting framework applies to disability discrimination claims that rely on circumstantial evidence. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817 (1973). To establish a prima facie case of employment discrimination under the ADA, a plaintiff must show that: (1) she has a disability; (2) she is a qualified individual with or without a reasonable accommodation; and (3) she was discriminated against because of her disability. <u>Rossback v. City of Miami</u>, 371 F.3d 1354, 1356-57 (11th Cir. 2004) (per curiam). Defendant challenges only the third prong of the test.

---

[18] These are the specific events Plaintiff contends in her summary judgment response were discriminatory in nature, and thus the Court will limit its analysis to these events.

With respect to the Reminder 1, Reminder 2, and Performance Improvement Discussion received on August 17, Plaintiff cannot establish a prima facie case of disability discrimination. Plaintiff argues that the disciplinary actions were related to the incident that resulted in Plaintiff's disability, but that is not the test. The question is whether Plaintiff has shown that she received those disciplinary actions <u>because of</u> her disability. Plaintiff has not presented any evidence linking the knee condition and the disciplinary actions, and there is no reason to think the August 17 discipline had anything to do with Plaintiff's alleged disability.

As for being required to take leave for her physical therapy while Mr. Clark was not required to do so, "[t]o establish unlawful disparate treatment, a plaintiff generally must demonstrate that his employer treated similarly situated employees outside of his protected class more favorably than he was treated." *See* <u>Burke-Fowler v. Orange County, Fla.</u>, 447 F.3d 1319, 1323 (11th Cir. 2006). Plaintiff and Mr. Clark are not similarly situated in all relevant respects. Most importantly, Plaintiff was subject to Defendant's workers' compensation policy under which she was required to take leave to cover any absences from work. Mr. Clark did not fall under that policy at the time he was allowed to make up his time by coming in early. Mr. Clark is not nearly identical to Plaintiff, which makes her disability discrimination claim on this issue fail.

Plaintiff's final contention is that she was reprimanded in the form of being suspended and ultimately terminated for sitting in the lobby but other non-disabled employees who sat in the lobby did not get in trouble. When a plaintiff alleges that other employees engaged in similar misconduct but were not similarly disciplined, the plaintiff must produce evidence that "the quantity and quality of the comparator's misconduct [was] nearly identical." McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008) (quotation marks omitted). While Ms. Parker did testify that she saw a handful of employees sitting in the lobby on various occasions, there is no evidence in the record that any person in a supervisory position saw them and failed to or declined to ask them to move or failed to otherwise address the matter. Plaintiff conveniently ignores that she was only suspended after being asked on more than one occasion to move out of the lobby and after directly refusing Mr. Banks' request that she move from the lobby. There is no evidence that any of the alleged comparators engaged in such conduct.[19]

The Court finds that Plaintiff cannot establish a prima facie claim of disability discrimination. Defendant is entitled to summary judgment on Plaintiff's disability discrimination claim.

---

[19] Plaintiff was fired for refusing to attend the October 20 meeting with Mr. Banks, not because she was sitting in the lobby. Thus, the termination is not relevant to this point.

### 3.    Hostile work environment claim

Plaintiff also attempts to raise a hostile work environment claim pursuant to the ADA. However, this claim must be dismissed. Plaintiff included three counts in her complaint: "COUNT I - HANDICAP/DISABILITY DISCRIMINATION," "COUNT II - RACE DISCRIMINATION," and "COUNT III - RETALIATION." Plaintiff did not specifically plead a hostile work environment claim in her complaint and no attempt to amend the complaint was ever made. Plaintiff will not be permitted to raise a hostile work environment claim for the first time in her response brief. *See* <u>Gilmour v. Gates, McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir.2004) ("[P]laintiff may not amend her complaint through argument in a brief opposing summary judgment."); <u>Iraola & CIA, S.A. v. Kimberly-Clark Corp.</u>, 325 F.3d 1274, 1286 (11th Cir.2003) (claims not raised in a complaint cannot be raised for the first time in plaintiff's response to defendant's motion for summary judgment).

The Eleventh Circuit addressed this exact issue in <u>Palmer v. Albertson's LLC</u>, 418 F.App'x 885, 889 (11th Cir. 2011). There, the district court refused to consider the plaintiff's hostile work environment claim because he did not raise it in his complaint. On appeal, the Eleventh Circuit examined the interplay between Federal Rules of Civil Procedure 8 and 10, and found that a complaint that included a "disability discrimination" count and a "retaliation" count did not

articulate a hostile work environment claim. "Even if those two counts contained sufficient factual allegations on which to base a plausible hostile work environment claim, Palmer did not articulate that he was making that claim. He should have asserted such a claim and done so in a separate count 'so that [Albertson's could] discern what he is claiming and frame a responsive pleading.'" Id. at 889 (quoting Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 980 n. 57 (11th Cir. 2008)).

Plaintiff's complaint suffers from the same problem found in the Palmer case. A hostile work environment claim stands on its own. The Court and opposing parties should not have to guess whether a hostile work environment claim is hiding in a discrimination count. Plaintiff should have articulated a separate count in her complaint alleging the hostile work environment claim.

There is also another reason the Court will not consider the ADA hostile work environment claim. It is not clear such a cause of action exists in the Eleventh Circuit. In Palmer the Eleventh Circuit stated, "[t]his Court has never held in a published opinion that a claim for harassment or a hostile work environment is available under the ADA," and declined to decide the issue. 418 F.App'x at 889 n. 2; see also, Gilliard v. Ga. Dep't of Corr., No. 12-11751, 2012 WL 6115913, at *7 (11th Cir. Dec. 7, 2012) ("We have not addressed the availability of a claim for a hostile work environment under either the ADA or the

Rehab Act."). In light of the question surrounding the existence of a hostile work environment claim under the ADA in this circuit and Plaintiff's failure to state a separate hostile work environment claim in her complaint, the Court declines to consider such a claim at this time. *See also* <u>Freeman v. Koch Foods of Ala.</u>, 777 F.Supp.2d 1264, 1277 & n. 5 (M.D. Ala. 2011) ("Given the lack of precedent in this circuit as to the existence of a disability-harassment claim under the ADA, this Court declines to recognize it today.")  Accordingly, Plaintiff's hostile work environment claim is dismissed.[20]

### B.    Title VII[21]

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42

---

[20] To the extent Plaintiff attempts to assert a racially-based hostile work environment claim, it is also dismissed. Plaintiff did not separately allege such a claim in her complaint.

[21] Because Plaintiff's claim pursuant to 42 U.S.C. § 1981 is asserted as a parallel remedy for alleged violations of Title VII, the elements of these causes of actions are the same and are subject to the same legal analysis. <u>Underwood v. Perry County Comm'n</u>, 431 F.3d 788, 793 (11th Cir. 2005); <u>Stallworth v. Shuler</u>, 777 F.2d 1431, 1433 (11th Cir. 1985) ("Where, as here, a plaintiff predicates liability under Title VII or disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical . . . [and] we need not discuss plaintiff's Title VII claims separately from his section 1981 and section 1983 claims.") Thus, the Court will evaluate each discrimination claim using one framework, regardless of whether the claim is brought under Title VII or § 1981.

U.S.C. § 2000e-2(a)(1). Plaintiff contends she was discrimination against based on her race. She relies on circumstantial evidence to support her race discrimination claim, which means the Court must conduct an analysis under McDonnell Douglas, 411 U.S. at 792.

Under the McDonnell Douglas test, the plaintiff bears the initial burden of establishing a prima facie case or "facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997); Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. Pennington, 261 F.3d at 1266. If the employer can give an appropriate explanation, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's explanation is merely a pretext. Id. A plaintiff cannot establish pretext by simply demonstrating facts that suggest discrimination, but must specifically respond to the employer's explanation and rebut it. Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1309 (11th Cir. 2007).

To establish a prima facie case of race discrimination, Plaintiff must produce circumstantial evidence showing that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse

employment action; and (4) she was treated less favorable than a similarly situated non-minority individual or was replaced by a person outside of her protected class. Maynard v. Board of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003).

Plaintiff alleges she was treated differently than similarly situated white employees who were able to order supplies and had students removed from their classrooms.[22] Defendant contends Plaintiff cannot establish a prima facie case of race discrimination for either of these claims, and further Plaintiff cannot establish that Defendant's non-discriminatory reasons for its actions were pretextual.

### 1.    Ordering supplies

Two white female employees were responsible for ordering supplies for the teachers at the Sumter YDC. Plaintiff had to submit her supply requests to those employees. She did not have authority to order supplies herself.

---

[22] In her complaint, Plaintiff alleges a discriminatory discharge claim based on her race. *See* Compl. ¶ 27. However, she did not address the discharge claim in her response to Defendant's motion, and therefore has abandoned that claim. Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1322 (11th Cir. 2001); Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994) (claims not addressed in response to summary judgment motion deemed abandoned). The Court will address Plaintiff's termination from employment only in the context of her retaliation claim.

Similarly, to the extent Plaintiff contends she was denied the right to seek medical treatment on August 12 as a result of her disability or race is also deemed abandoned for failure to address the claim in her response.

Under the facts presented in this case, Plaintiff not being allowed to order school supplies is not an adverse employment action for purposes of Title VII. To prove an adverse employment action, an employee must show "a serious and material change in the terms, conditions, or privileges of employment." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis omitted). "Moreover, the employee's subjective view of the circumstances and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Id. Here, the evidence shows that during the duration of Plaintiff's employment at the Sumter YDC other people ordered the school supplies. That task simply was not part of Plaintiff's job. There was no change in the terms, conditions, or privileges of Plaintiff's employment, much less a serious and material change. Without showing an adverse employment action, Plaintiff cannot establish a prima facie case of racial discrimination.

### 2.    Having students removed from classroom

Plaintiff also contends that she had to repeatedly request that J.T. be removed from her classroom, while white teachers did not have to make the same numerous requests. But even assuming Plaintiff can establish a prima facie case of discrimination with respect to J.T. not being immediately removed from her class, she has not established that Defendant's reason for its action is

pretextual. The evidence in the case is that the two week delay in reassigning J.T. out of Plaintiff's classroom occurred because there was not another special education math teacher and the student had to be moved to a regular math class, which took time. Plaintiff has not responded to this explanation, much less rebutted it. Plaintiff's racial discrimination claim as to the removal of students fails.

### C.     Retaliation

Plaintiff's final claim is that she was retaliated against on the basis of both her race and her disability.

The anti-retaliation provision of Title VII makes it unlawful "for an employer to discriminate against any . . . employe[e]" who (1) "has opposed any practice made an unlawful employment practice by this subchapter" (the opposition clause) or (2) "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (the participation clause). 42 U.S.C. § 2000e-3(a).

The ADA's retaliation provision makes it unlawful to discriminate against any person who "opposed any act or practice made unlawful" by the ADA. 42 U.S.C. § 12203(a). "Acts or practices made unlawful" by the ADA include "coerc[ing], intimidat[ing], threaten[ing], or interfer[ing] with any individual in the

exercise or enjoyment of . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b).

Retaliation claims under Title VII and the ADA are analyzed under the same rubric. Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999). To avoid summary judgment, a plaintiff must establish a prima facie case of retaliation by showing three elements: (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. Id.; Stewart, 117 F.3d at 1287. Once a prima facie case has been established, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the challenged employment decision. Id. The plaintiff then must "demonstrate that it will be able to establish a trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." Stewart, 117 F.3d at 1287.

Plaintiff's complaint does little to spell out her alleged protected activity or the alleged adverse employment actions. Even her response to Defendant's motion does not clearly outline her claim, other than her belief that her termination was in retaliation for exercising her rights. Giving Plaintiff the benefit of the doubt as the non-moving party, the Court will assume that Plaintiff claims the following amounted to adverse actions for purposes of her retaliation claim: (1) the Reminder 1, Reminder 2, and PID received on August 17, 2010; (2) the

Reminder 1 received on September 15, 2010; (3) the Decision Making Leave notice received on October 8, 2010; (4) the suspension on October 20, 2010; and (5) the termination. Plaintiff can be said to have engaged in statutorily protected activity as follows: (1) August 18, 2010 request for accommodations;[23] (2) August 24, 2010 grievance claiming race and gender discrimination; (3) September 15, 2010 EEOC charge; (4) September 23, 2010 grievance claiming race and gender discrimination; (5) September 27, 2010 request for accommodations; and (6) November 12, 2010 EEOC charge.

The Reminder 1, Reminder 2, and PID received on August 17 are quickly disposed of because Plaintiff had not engaged in protected activity prior to those actions. Plaintiff did not engage in any protected activity until August 18. Defendant cannot retaliate against Plaintiff for something that has not yet occurred. *See* Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1278 (11th Cir. 2008) (holding that the decision maker must know about the protected conduct at the time of the adverse action).

The Court finds that the September 15, 2010 Reminder 1 was not a materially adverse action. As discussed *supra*, an adverse employment action must involve a serious and material change in the terms, conditions, or privileges

---

[23] Other courts have recognized that requesting a reasonable accommodation may constitute a protected activity. *See, e.g.,* Norman v. S. Guar. Ins. Co., 191 F.Supp.2d 1321, 1336 (M.D. Ala. 2002); Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 191 (3d Cir. 2003) ("The right to request an accommodation is no less a guarantee under the ADA than the right to file a complaint with the EEOC.")

of employment. Further, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in [the retaliation] context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405 (2006). There is no evidence that the September 15 Reminder 1 caused harm to Plaintiff. There is no evidence that the Reminder 1 affected Plaintiff's salary, job status, or any other terms of her employment. Further, the Reminder 1 did not dissuade Plaintiff from making other charges of discrimination. *See* Morales v. Ga. Dep't of Human Res., 446 F.App'x 179, 183-84 (11th Cir. 2011) (finding no adverse action where the plaintiff's evaluations and reprimands did not dissuade her from making another discrimination charge); Tarmas v. Sec. of Navy, 433 F.App'x 754, 763 (11th Cir. 2011) (holding that the plaintiff "has not shown that the email citing poor job performance was a materially adverse action" because the plaintiff was not dissuaded from pursuing his claim after receiving the email). As Plaintiff herself was not dissuaded from making a discrimination claim, the Court will not find that a reasonable employee would have been dissuaded from making a claim. *See* Shannon v. Postmaster General of U.S. Postal Serv., 335 F.App'x 21, 27 (11th Cir. 2009) (the fact that the plaintiff filed his last two EEOC complaints after the alleged adverse action casted doubt on whether the actions were the sort that

might have dissuaded a reasonable worker from making a charge of discrimination); Burgos v. Napolitano, 330 F.App'x 187, 190 (11th Cir. 2009) (holding that the defendant's actions were not materially adverse because the evidence showed that the plaintiff was not deterred in reinstating her EEOC claim). Thus, Plaintiff cannot establish a prima facie case as to the September 15 Reminder 1.

With respect to the October 8 Decision Making Leave, October 20 suspension, and Plaintiff's termination, Defendant concedes for purposes of its motion that Plaintiff can establish a prima facie case of discrimination. However, Defendant contends that Plaintiff cannot show pretext as to any of these actions.

Because it has conceded a prima facie case of discrimination, Defendant must now produce evidence that it had legitimate non-discriminatory reasons for its actions. This burden of production involves no credibility determination and is an "exceedingly light" burden. Perryman v. Johnson Prod. Co., 698 F.2d 1138, 1141 (11th Cir. 1993). The employer must simply articulate "a clear and reasonably specific" non-discriminatory basis for its actions to discharge its burden of production. Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S.Ct. 1089 (1981).

Defendant has met its burden of production for all three actions. Defendant issued the October 8 Decision Making Leave based on Plaintiff's violation of

department policy and a security agreement by sending an email containing the name of a student and personal information relating to him to an email address not affiliated with Defendant. Defendant suspended Plaintiff on October 20 because of her refusal to move out of the lobby as requested by Mr. Banks. Defendant was terminated for insubordination for refusing to go to a meeting with Mr. Banks in his office. These are all legitimate, non-discriminatory reasons for the actions taken by Defendant. It does not matter whether Defendant was actually motivated by these proffered reasons. Burdine, 450 U.S. at 255. "The presumption raised by the prima facie case [has been] rebutted . . . and drops from the case." Bryant v. Jones, 575 F.3d 1281, 1308 (11th Cir. 2009) (citing Burdine, 450 U.S. at 255).

Now it is up to Plaintiff to "show that the [defendant's] proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." McCann, 526 F.3d at 1375. A plaintiff may demonstrate that an employer's reason is pretextual by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation omitted). Rather than "simply quarreling with the wisdom of [the employer's] reason," the plaintiff "must meet that reason head on and rebut

it." Ritchie v. Indus. Steel, Inc., 426 F.App'x 867, 872 (11th Cir. 2011) (quotation omitted). Furthermore, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs." Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1266 (11th Cir.2010).

Nowhere in her response to Defendant's motion does Plaintiff directly address pretext as relates to the October 8 Decision Making Leave. She certainly has not shown that Defendant's "proffered reason was not the true reason for the employment decision." Burdine, 450 U.S. at 256. The email at issue is in the record, and it clearly shows that Plaintiff sent an email with protected information to an email address not affiliated with Defendant. The protection of student information is a very serious issue for schools, and it is completely understandable that teachers who improperly disseminate that information would be disciplined. Plaintiff has in no way discredited Defendant's proffered reasons for its actions.

As for the suspension and termination, Plaintiff makes three arguments as to why Defendant's proffered reasons for those actions are pretextual. First, Defendant deviated from its policies and procedures. Second, Defendant was trying to "dig up dirt" on Plaintiff. Third, Plaintiff's termination was implausible.

An employer's deviation from its own standard procedures may serve as evidence of pretext. Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286,

1299 (11th Cir. 2006). Plaintiff contends that other employees sat in the lobby and none of them were disciplined, and this deviation from policy demonstrates pretext. But Plaintiff omits the rest of the story. While Ms. Parker saw other employees sitting in the lobby and to her knowledge they were not disciplined, there is no evidence that Mr. Banks or anyone else in a position of authority saw those people sitting in the lobby, or even that Ms. Parker told Mr. Banks about people sitting in the lobby. There was no deviation from the policy because there was no reason to apply the policy to anyone other than Plaintiff. If there was evidence in the record that Mr. Banks saw Employee X sitting in the lobby and ignored him, Plaintiff's argument might have some weight. But as the record stands, Plaintiff has not shown a deviation from standard policy sufficient to establish pretext.

Plaintiff's next argument is that almost directly following her protected activity, Defendant started "digging up dirt" on her, which ultimately led to her termination. The three cases cited by Plaintiff in support of this theory are distinguishable from and inapplicable to this case. *See* Giardina v. Lockheed Martin Corp., No. Civ. A 02-1030, 2003 WL 21634934, at *10 (E.D. La. July 3, 2003); Ponce v. Cingular Wireless, LLC, No. CIV 03-21939, 2005 WL 5454213, at *3 (S.D. Fla. Nov. 17, 2005); Pullom v. U.S. Bakery, 477 F.Supp.2d 1093, 1106 (D.Or. 2007). In each of those cases, there was evidence that the

defendant was in fact "digging up dirt" on the plaintiff or disciplining the plaintiff in an effort to build a case to terminate her. Notably in both <u>Giardina</u> and <u>Ponce</u> there was specific testimony from other employees that the managers involved in the adverse employment actions complained of were actively trying to dig up dirt on the plaintiffs to use against them. No such evidence exists in this case.

The final pretext argument advanced by Plaintiff is that her termination was implausible. Plaintiff states she had never received any discipline prior to her protected activity. She again contends that other employees were allowed to sit in the lobby without recourse, and states that it was reasonable for her to refuse to speak with Mr. Banks in his office on October 20 without a witness based on their meeting on September 22.

"A plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where . . . the reason is one that might motivate a reasonable employer." <u>Combs</u>, 106 F.3d at 543; *see also* <u>Damon v. Fleming Supermarkets of Fla., Inc.</u>, 196 F.3d 1354, 1361 (11th Cir. 1999) (emphasizing that courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision"). Plaintiff has not shown that a reasonable factfinder could find Defendant's proffered reasons for her suspension and

termination unworthy of credence. The evidence shows that Defendant reasonably determined that Plaintiff had been insubordinate on both October 19 by refusing to move from the lobby when asked, and on October 20 by refusing to attend the meeting with Mr. Banks, and that her insubordination warranted her termination as an employee. There is no factual dispute over Plaintiff's insubordination - the evidence shows she refused direct orders on both occasions. In any event, the appropriate inquiry is whether the adverse action was based on a good faith belief that the employee had done wrong, not whether the wrong was actually committed. *See* <u>EEOC v. Total Sys. Servs., Inc.</u>, 221 F.3d 1171, 1176-77 (11th Cir. 2000). Plaintiff has presented nothing to dispute Defendant's good faith belief that Plaintiff had been insubordinate. Plaintiff did not get a free pass to behave however she wanted at work when she engaged in protected activity. Because Plaintiff has not rebutted the reasons for her suspension and termination, her retaliation claim cannot survive summary judgment.[24]

## IV.   CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment is granted. The Clerk of Court is directed to enter final judgment in favor of Defendant.

---

[24] Even if the Court considers the alleged retaliatory events collectively, Plaintiff's claim still fails because she has not established that each of Defendant's proffered reasons for each of its actions were pretexts for retaliation.

**SO ORDERED**, this the 27th day of March, 2013.

*s/ Hugh Lawson*_____
**HUGH LAWSON, SENIOR JUDGE**

mbh